Our next case of the afternoon is Strawbridge v. Schafer, 4141080 for the appellant, Mr. Carruthers, for the appellee, is it Hebron or Hebron?  Hebron. Hebron. Very good. You may proceed. Good afternoon. My name is Andrew Carruthers. I'm with the firm of Hepler Broom in Edwardsville, Illinois. And I am here today representing the appellant. Our name is Kathleen Strawbridge. Just by way of brief background, my client purchased certain property in Brighton, Illinois. It's in a rural area. It consists of several acres. It joins a tract owned by the defendants, the appellees, which also consists of several acres. A few years after acquiring and moving, she actually resides on the property. She commissioned a survey be performed so she could determine the exact location of the property line. The neighbor, the defendant appellees, they have a cattle fence that was installed some years ago to give you an idea of what it looks like. It consists of wooden posts every so often connected by barbed wire, some wire, whatever you would need to keep cattle in. It's not any type of a privacy fence or anything like that. The fence itself runs, for the most part, runs most of the, along the true property line, but at a point it diverts into my client's property and encroaches for a considerable distance and then just stops about what we estimate to be about 95 to 100 feet short of the rear corner of my client's property. Mr. Carruthers, in your pendants you have an exhibit A4. Yes, sir. Which, by the way, at my age is too small for me to read, but I had to try to blow it up so I could try to figure out what's going on. Where is the west property line on that? Yes. On that survey. And I have the exhibit in front of me, the west property line. Could you bring that up here so I can see it? It's too far away also. Is it the dark line? And I can barely make out the, what is the fence? Yes, this is the west property line here, and this is my attempt to sort of connect the dots. As you see, you may see there's a little dashed line there. So this is where the property line is, this straight line here, and the different rebars, pins that designate where the property line is. Okay, so then that far straight north and south line is what the survey says, the west line of your client's property. That's correct, yes. And then that darker line connects the dot, or the X's, which represent the fence? Yes, that's the fence. Okay. And then it stops right about there, which we showed you about now, which at least the surveyor believed to be about 95 feet, showing my client's rear corner. Okay, and at the bottom of that survey, where the fence stops, which you've traced, following those X's, and then goes straight west about 90 some feet, what's that dark line represent? That's just connecting the dots. Okay, and there's no fence there? No, not to our knowledge, Judge. The dots stop, the dashes stop right there at that corner about 95 feet in. So it's not as though it zags back or anything. It's just literally what we have is a fence that goes out to here. Okay, well, if the descendants did have cattle or horses on the west side of the fence, what would prohibit the cattle or horses from going on east when they get to the south 90 feet, where there is no fence, where it stops? Why couldn't they just go over into your client's property since there's nothing there? I suppose there would be nothing to prevent them from doing that if they were to go all the way down, as it were. The cows that my client had noticed were up here more towards where the house is, nearer to the road. But to answer your question, I suppose if they were to go all the way down, for practical purposes, I can certainly see how that would be. Livestock kind of follow a fence line from time to time, and eventually would find a 90 foot opening. Find a place to cross, certainly. And you're saying, now that we're already on this, and then I'll let you get back to your main argument, I don't want to mess you up on your train of thought, but you're saying there's nothing in the court order, and I know you have arguments that you want to make, but just contrary to this, but in the court order there's nothing about that final 90, 95 feet that it addresses. Not at all. At all. The court order just says that my motion for summary judgment denied, defendants granted, and that any territory west of the fence is now going to be owned by the defendants. Well, could west of the fence mean from the southernmost point of where the fence exists, everything west of that? I mean, would that be a reasonable interpretation? It would. The concern that we have, obviously, is my client, who doesn't tend to move anytime soon, if she were to want to finance it or sell it, we really don't know what we're conveying at this point. What have they, and that was one of the positions raised in my motion to reconsider, we're actually now in a situation where the who owns what is even more confused than it was before, in that we don't have a legal description, we don't have anything that clearly defines where the line is other than a fence, which although I know there is certainly some disagreement about whether or not they've maintained it over the years, at best it's an old fence that has fallen down on occasion, has required repair, whether or not it's been repaired, and that is now the marker. It's not a natural boundary like a river, which typically doesn't move or erode or anything. So it's something that can be easily moved. So at this point, and that was one of the issues that I appealed on and I took issue with in the court's order, was we don't have any definite idea as to where the boundary line is. And I know that this court, as recently as last year in Brandhorst v. Johnson, reaffirmed what has become or what appears to be the common theme, and that is it's not enough simply to satisfy the five elements of adverse possession. In order to prevail in a claim for adverse possession, you also have to exactly define what it is you are seeking to obtain title to via adverse possession. And at no time has that, even whether in the court's order, in the affirmative defense raised by the defense, the exact boundary, the exact defined area of what they're seeking to have transferred was never raised. So that's why it's not only a problem with the court's order, but we also have an issue of, well, were the elements of adverse possession actually established? Even if he were able to establish the five, including the continuity element that I continued, they haven't due to the failure to maintain the defense over the years. We find that the courts, their failure to adhere to what I'll call the sixth element, which is to clearly define what it is that you are seeking to transfer, would be enough to have a reversal and remand for further hearing for failure to designate exactly what it is they were taking. Well, let's assume for the moment. Again, I'm going to get you off track. Let's assume for the moment adverse possession is shown. And that part of the order was affirmed. And this is obviously hypothetical. What prevents the parties from entering into an agreed order and establishing a marker? If the dispute was between the parties, the dispute is resolved, all they have to do is agree with each other and establish a marker, which would tell the world this is the line. I certainly agree with that, and I can represent to you that overtures were made long before coming here. That may or may not have prevented that, because it does seem an easy solution. Now we have a situation where you don't know how much you own, and we don't know how much we've lost exactly, so why don't we just figure it out? Obviously we didn't. That's one of the reasons why we're here. But we appealed on three different issues. One was, of course, the court's denial of our motion for summary judgment. We had, in support of our motion for summary judgment, passed an affidavit completed by a surveyor and the survey to show here is where they determined the property line to be relative to the location of the fence. And that affidavit was, there was no real response to that. It was uncontroverted. It was the only expert evidence that was in the record on that. The court found, actually entered a finding in its order, that we had established, the court initially finds plaintiff or plaintiff's predecessor entitled to be the true owner of the land at issue. So the court actually entered a finding that my clients were the true owners of the disputed strip, or the land in dispute. However, for whatever reason, the court denied the motion for summary judgment. I would have expected that the court, in finding that my clients were the true owners of record for the property, would have granted my motion for summary judgment as to our issue. But then, if they were so inclined, grant the defendant's motion for summary judgment. And it sort of, so plaintiff's, it's yours, but now in the subsequent order, we're going to take it away from you from the adverse possession. I just procedurally, I took issue with that in believing that the trial court should have granted my motion for summary judgment, given the findings that it made in the evidence in the record. But that wouldn't have prevented them from also granting the other sites. Absolutely. For purposes of appeal, we wanted to raise that so that if it does go back, we want to, in consistent with the court's finding that my clients were the true owners of the property,  I think the terminology true owner was a little bit loose. I think actually the court was referring to record owner. Record owner. Right. Subject to, of course, an adverse possession claim. Let me ask you this. As I understand it, your client's deed describing the western boundary was different than the survey. Is that true? No. No? My client's surveying company, Shepard, Morgan, and Schwab, went off of the deed, and the deed and comparing to the rebars and trying to determine the location of the property line. I think the issue that was raised by the appellees was comparing the legal description of my client's deed to a legal description in a deed from, I think, 1980 or at some point in the past. I misunderstood it because I thought the survey was different from your client's western boundary and from the defendant's eastern boundary. But I'm wrong. It was just different than the deed of the defendant's eastern boundary. Yes. Okay, just to be clear then, the survey of the western boundary matches the legal description in the deed for your client's western boundary? Yes. I think the issue that the appellees took, and obviously I'll speak to that, but I think it was that the legal description that established the western boundary in one deed was different than the one that his client received 30 years earlier to establish the eastern. I think that was the difference, and the survey reflected one but not the other, and I think that was their position in trying to make an argument against our expert survey. There was no other survey submitted, so that's one of the reasons why I think the court shuns it. What's your position on the 20 years of continuous possession? Is it that even though 20 years may have been continuous, if the 21st or the 25th year thereafter, something is done to break that continuous nature of the adverse possession, a new 20 years starts? Or is it your position that once 20 years is established, that establishes adverse possession? My understanding of the doctrine of adverse possession and dealing with it in the past is that once you've established the 20 years, you have rights. I mean, I could, in theory, if we were next-door neighbors and someone's been using it, in another case I had in a driveway, for 20 years adversely, and all of a sudden, the true owner kicks them off since you can't, I don't think that changes. Or if they stop and go a different way, I don't think that necessarily. My interpretation of the law doesn't, that tolling or that stop, as long as they satisfy the continuous 20 years, at worst, it being their burden to show that. I mean, all we really know is from the affidavit, and my client having acquired her property in 2007, I think through a distressed sale, so she couldn't really go back to the former owner and inquire about the history of this fence. So all we really have to go on is their affidavit that it was installed in 1980, of course. What they also have to show, and we don't think they have shown, is that it has been maintained and used for the required period of time. And that's what we don't know. The defendant appellees, they don't live out there, unlike my client who lives there. The defendant appellees, to my understanding, live elsewhere. They don't live there. That's just some family property. It's been the family for a long time. So it's not as though they've been out there using it consistently. Essentially, what we think happened is in 1980 or thereabouts, according to the appellees, a fence was erected, and to the extent that it was ever maintained or it was moved at any time, that remains to be seen. It's their burden to show. And the only thing that the trial court really had to go on in finding that adverse possession had been met was the affidavit and the general statement that was made in the defendant's affidavit that on several occasions over the years, we've repaired the fence, something to that effect. And we contended that, in applying the laws we have in our brief, that that is too general and broad, vague a statement to have the specificity required to show that, yes, in fact, there has been active use, adverse use of this property for the required period of time. So we think that what the court had in the record and relied upon in granting the defendant's motion for summary judgment and finding that all the elements were established was an error because really of that issue and that among the failure to clearly define the area that is being conveyed. So it's a pretty heavy standard that they have to meet. They have to show by clear and convincing evidence that all the requirements were met. This fourth district in the estate of Tobin long ago found that to prevail in a claim for adverse possession requires strict proof and cannot be made out of inference or implication with all presumptions being in favor of the holder of record, which is my client. This conclusory statement that the defendant had in its affidavit, we contend, was insufficient to meet this burden. And our brief cites Cagle v. Valter, another case where the court found that just the vague testimony of taking care of brush and clearing it over the years, that that was insufficient to establish the strict proof required to acquire adverse possession rights. Now, as I've already demonstrated, we kind of take issue also with the trial court not requiring any specific legal descriptions. The way the defense is, as I've described it, we have wood posts that are on the ground that can easily be moved one way or the other. My client has contended that she has not only found cows on her property, but the fence, which is located, as you've seen, in part on her property, has also been knocked down in a place of disrepair. For the order as drafted to stand, even assuming that the court doesn't find fault with the trial court's granting of defendant's motion for summary judgment, we find that was proper. I mean, even now, we're no better off than we were in the beginning. In fact, it's more confused, because we have a fence that's been down in places that could easily be moved at any time by anybody, and all we have is a corridor that says, well, everything west the defendant owns. Well, that could change, and for that reason, it's the failure of the defendant to fully illustrate what they were seeking in their petition, we find, completely, certainly fails to meet the high burden of clear and convincing evidence to acquire adverse possession rights. Well, if we agreed with you on that point, what should we do, remand it, tell the trial court there has to be another survey to establish a legal description for where the fence runs, and then, if so, who would pay for it? I think that if you were to find it consistent with the court's finding in several cases, specifically a recent case in Broadhurst v. Johnson from last year, in finding that I think you would find that the defendants failed to satisfy. I mean, it's not just the court didn't set out or require a legal description. It's also that the defendants failed to include a legal description or any type of description beyond everything west of the fence in their request for adverse possession rights. So I think what you do is you reverse the court's granting of the defendant's motion for summary judgment for failure to adhere to that, what I'm going to call, the sixth element of adverse possession, failure to clearly designate that what it is that you are seeking to acquire rights in. So when you send it back, I'm thinking that you could do it for a couple of reasons, but that is to the issue of failure to accurately describe what it is you're taking. I think that alone could be enough to send it back. Send it back for what? Just to remand for further hearing, to have them demonstrate, I suppose they could file an amended petition of sorts to fully set out what they are seeking, but the record as it is now doesn't set that out at all. So I think what you remand it back to isn't to compel the court to conduct a limited, I think they just failed to meet the elements of adverse possession. So it's just a trial on those elements, and I think if I were representing the defendant, I would probably come with an amended complaint saying, here's exactly what we want, because by my read of the law, that's what they were required to do. Could this survey be recorded? It's not recorded to my knowledge, is it? No, it is not recorded. Could it be recorded in the public record for someone to ascertain where the boundary line is? Well, President, I think the defendants take issue with that survey. If they agree with that survey, it would be news to me. No, I'm talking about to some way establish that the mark where the fence by your dark line that runs on the west part would establish the western boundary of your client's property. For me, if we were to go back and the judge would say, let's just record this if everybody agrees on it, I think even that would be insufficient, and certainly to a title company, and the title work I've done in the past, because what you have essentially there is, you have a survey that depicts where the line is. Well, I think it would be insufficient, but if the public would be unnoticed, if there's a question there, the survey is probably going to have to be provided that, in some fashion, tracks where you, in fact, have drawn a line that traces where the fence runs. Yes. Thank you. We'll hear from the Honorable. Good afternoon. My name is William Hebron. I represent David and Wayne Schaefer, the appellees in this case. I'm asking you to affirm the judgment of the lower court in this matter. I think it was appropriate. I want to start off by saying the appellant has been injecting a lot of facts into this argument that are not supported by the record. There's nothing in the record concerning the fence being in disrepair, in terms of at least rebutting anything we've said. There's nothing about that, the fence falling down. All these allegations that he's made during his argument are not supported by the record, and if you look through the record, you won't see any of that. We're the only one that filed an affidavit in this case. Can I ask you a question? We know we have the elements of adverse possession, but then opposing counsel is talking about what he has called the sixth element, this element of proving specifically what portion of the land. What's your take on this sixth element? I think that's an argument to be rejected. I mean, in these kinds of possession cases, you're not going to get a fixed boundary. You're not going to get a legal description. You don't get those. When you get this kind of a situation, you get ordinarily some kind of boundary that is not a legal description, and I've given you a couple of cases in my brief where essentially the Supreme Court said one of them was a fence, and that's the line. That's the line. There may have been a mistake as to what the line was, but there was adverse possession of the period. That's the line. There's no description. The fence is a line. Another one is like trees and flowers. There's a tree and flower bed. That's the Joyner case. I mean, there's no legal description. What he's talking about, and even the cases he cited in his brief, I don't know about the others, are contract cases. I mean, contracts are entirely different. You're dealing with a situation where you're entering into an agreement to buy and sell certain ground. You get pretty good descriptions of what you're buying. By the way, there's some leniency even in those situations in terms of adding things to determine the exact property being bought and sold in those situations. We've got a whole different situation. Adverse possession, you get boundaries, not based on legal descriptions at all. And by the way, I mean, these problems can be solved. You know, when it comes time to sell this property, you just say, I can't warrant that end. I can't give you that. I'll quick claim you what I got. I mean, there's a solution to this problem. It's just they don't like that solution. So I don't know if I've answered your question. Well, if the fence line moves. Well, that's always a possibility in adverse possession situations. But you can certainly go out right now and knock it down and know where it is. A surveyor can tell you where that is. As a matter of fact, the case they cite concerning legal descriptions talks about something that. . . What do you mean, go out and knock it down? Well, he could give you a legal description of that fence run. A surveyor could do that for you. You didn't mean knock down the fence. No, I didn't mean that. I meant he could knock it out. I'm sorry. I mean, he could nail it down, knock it out. Yeah, I'm sorry. Okay, what do you mean knock it out? I didn't mean knock it out. You know what I mean? He could go in and survey the ground. He could go in and say, here's the fence. Here's where the location of this fence is. Okay, what if somebody did move the fence? And you can't discern where it was until the surveyor got out there. I mean, that's always a situation in adverse possession. You've got to keep track of where the fence line is. And by the way, in terms of settlement, we tried to settle this case. I mean, we tried to settle it early on. But you're conceding if somebody goes out there and changes the fence, then that changes the court order. No, I'm not conceding that at all. It's the fence line as it exists now. It's not later. It's at the time of the judgment. It's the fence line at the time of the judgment. But you can't tell. So is the onus on the property owner to establish where it is at that time that the court rules so that they have that for future reference? It's a burden of both. It's a burden of both of them. You've got a situation where a person has acquired property by adverse possession. Quite frankly, at this point, has there been any disagreement as to where the fence is? There is a disagreement concerning the location of the fence and whether or not it's on their property or ours. I understand that. But I'm talking about literally this is right here, right now. There hasn't been a disagreement about the location of the fence. As a matter of fact, we've got an affidavit that we submitted that said we put this fence up in 1980. And since 1980, it's been in the same location. We've got an affidavit that's filed a record with our summary judgment that's never been rebutted that says that. Your affidavit also says the plaintiff caused the, I think you're referring to posts, to be placed west of the fence line. Is that right? Isn't that what your affidavit says? And we made them move it. You're talking about, hell, when did that happen? They didn't acquire the property until 2007. And we would have acquired adverse possession by 2000. By the end of 2000, we've got adverse possession. So you're saying it doesn't matter when it happened? I'm just saying after we built it in 1980. Think of that same paragraph 12 in the affidavit. Affion and his father have caused fence posts to be removed. When did that happen? How do I know it didn't happen prior to 2000? Or maybe it happened after 2000. First of all, the time is what I'm saying. First of all, they didn't own it until 2007. I understand that. Going to paragraph 12, when did any of those things happen? And isn't that important to be included in the affidavit? Well, yes, except that it says that plaintiff did it. So it had to be after 2007 that plaintiff placed a fence post west of the fence. That would be the second part of paragraph 12. But the first part, does he and his father have caused fence posts to be removed? Which plaintiff caused to be placed west of said fence? I think those are read together. I mean, that happened after they acquired ownership of the ground. Okay, well, who submitted the affidavit? I did. My client did. Who did? My client, Wayne Schaefer. And your client is saying in this affidavit, sometime after plaintiff acquired, was the property owner of record, they placed some fence posts west of where the fence is. Right. And you caused those to be removed. Right. Or your client caused those to be removed. Yes. Going to the open and hostile elements. Correct. Elements. That's right. Oh. Well, I guess I just have a hard time with English. So that's what you mean by paragraph 12. Who removed the fence posts? That's what I'm asking. It looks like to me both of them did. No. My client caused people to come out and do it. He had people do it. Is it correct that the original fence that your client put up was not moved? That's right. That's right. Away from that fence, some additional posts were placed in the property that your client says you adversely possess, and your client had those removed. That's correct. That is correct. So that's what paragraph 12 means. Our fence has never been moved. Okay. I'm sorry. I'm sort of thick there. I'm sorry. No. I was the only person in the courtroom that didn't get it, so. Counselor, maybe it's your manner. But you're trying to educate us. I shouldn't be. No, you should. So being exasperated at our inability to grasp the complexities of adverse possession on farm property or on rural property, I wouldn't ask the question unless I didn't know the answer, and then I'd want you to give me the answer. I guess I'm just a little exasperated because there's a lot of factual information that's been injected into this record where there's no affidavits or any documentation to support that. We understand that there's no counter affidavit to your motion or to your affidavit which was filed as part of your motion for summary judgment. I mean, I've heard all kinds of stuff that's not in the record at all. So I just want to make it clear that that's the situation and that's a major problem for them. Well, basically your argument is that the only thing the court really has in mind is the affidavit that you submitted on behalf of your client because there was no counter affidavit. That's right. That's right. And there was also in terms of there was an interruption. Just because we're asking questions and I had a hard time understanding paragraph 12, I'm trying to give you the opportunity to explain it to me, and I'm glad I did ask it because now it seems pretty clear to me, but seemed ambiguous. Justice Holderwhite was able to straighten it out apparently. Well, the other thing is that I think counsel, I don't think, I know, they're saying your affidavit is deficient. Do you want to speak to that in terms of conclusions or facts? I mean, I don't know how you can, I think these are well-pleaded facts. It's like on August 13th of 80, my clients acquired title to this property. On August 30th of 2011, David, one of my clients, transferred himself as trustee. So his interest moved from himself individually to himself as trustee. But those first three paragraphs really aren't in dispute. Okay. As far as I can tell. In 1980, the defendants installed a five-strand barbed wire fence approximately five feet in height, complained of, and they're complaining. So in 80, we built this fence. The fence has been in the same location since it was installed in 1980. That's an allegation. That's a factual allegation. Up to the time that, after the plaintiff acquired the property, were your clients still running cattle and horses? I would say on and off. I don't know. I can't tell you. I can't tell you specifically. There were certainly periods of time when they had cattle. That's why they've got the fence to keep the cattle and horses in. So they've had cattle and horses there. I think the affidavit says that during the period, you know, they've had cattle and horses enclosed by that. That's why the fence there. I asked this in opposing counsel, how could they be enclosed if the fence doesn't go to the southernmost part of the property? I mean, that question has never been raised until right now. There's nothing in there that even suggests that it's not enclosed down on that end. There really isn't. Okay. I mean, they've got a survey, and you ask a question about the real estate. The deeds, the descriptions on the deeds are different. We've got a deed in 80. They both start from the same point of commencement. But for us, that's a point of beginning. And we own ground to the south of the appellant's ground and west. It's sort of an L-shaped piece that wraps around their property. And we go east, then north up to sort of the southeastern edge of their property, and then run along the southern edge of their property down to a location where we cut north. And that description, if you use it, it doesn't give you the same location. It's a different description. It puts you in a different place. That northern boundary, where you cut back from, the course and distances on that are different. The other thing I would say is, their survey, if you look at their survey, the highlighted courses and distances on their survey do not match the deed. Which deed? Their deed. Well, that's the question I asked him. He said it did. They don't. So what I ask, so the survey doesn't either meet the east or describe in the same way the eastern boundary of your client's property, nor the western boundary of opposing counsel's client's property. I feel that's true. Okay. That's what I thought. I'll be honest, I think you could take two surveyors out there and you may not get the same locations. Well, that's pretty typical. So, I mean, it's. I'm surprised. So, anyway. Right. Well, okay, before you leave what you were just talking about, that last 90 feet, suppose this court does find adverse possession, there's a dispute about what happens to that last 90 feet, because the court order says everything west of the fence line. And I think that's all we get. Okay, so that bottom 90 feet is. If that's theirs, they get it. Well, is it theirs? Because I couldn't tell from your. I don't know. To be honest with you, I don't know whether it's theirs or not. I don't know the answer to that question. Well, then that would seem to suggest that his argument is right. There's still ambiguity. All we asked for, all we ever asked for was adverse possession west of the fence. So your position is if the fence doesn't go all the way down, it's theirs. If it does go all the way down, it's ours. Yeah, that's right. We get the property west of the fence. That's what we get. And that's adequate. If there's no fence, you can't get property west of the fence. I can't get anything west of the fence that doesn't exist. I would agree. I would agree. I mean, these are insurmountable problems, by the way, in terms of trying to buy and sell land. You just quit claim, do things to sort of straighten up your title. This can be done. It's not hard to do. You've got to get people who are willing to work with each other a little bit. But it can be done. And so, I mean, the description is adequate. All we said is we get the property west of the fence by virtue of adverse possession. And that's what we've got. And you're saying there's nothing in the record to show where the southern, the most southern part of the fence is or ends, other than the survey, I guess. I don't even know if the surveyor even gives you. First of all, the document you have has got markings on it. I don't even know if the surveyor certified the fence on it. I think he certified the location of the boundaries. But based upon their description, not ours. I mean, we had a survey done. Before we bought it, there was a survey done in 78. Right. And we thought we were right when we put the fence up. But that's not in the record. I don't want to mislead you. So further argument? I would just indicate that this is a lawsuit. It involves a fence which was built in 1980 and served as a boundary line between two pieces of property for more than 30 years. The suit wasn't filed in 2011. It served as a boundary line during all that time. I've had an affidavit, I think, with properly deeded fleet of facts that establishes that, that we've claimed use and ownership of it and used it that way. So it's been that way for 30 years, more than 30 years, more than that now. Long, long time. They didn't acquire title until 2007. That fence had been there probably about 27 years then. They knew the fence was there. It was there. It had been there a long, long time. Establishing a location. They knew about it. They didn't even do anything about it until 2011. I think it's real clear that we've established our ownership by adverse concession. We've got well-pleaded facts that establish that. There's no affidavits rebutting any of this. There's a lot of allegations here today, nothing supported by affidavits, to suggest this, that, or the other. But I would say this. By 2000, by the end of 2000, we've got adverse possession of that ground. It's done. I mean, they don't even know about it. They could have given you all kinds of affidavits about the fence being in bad shape, about other people using this ground besides us, all kinds of things in terms of the cases they show you. That there was a break in the chain of ownership, of claiming adverse possession. There's lots of things that could have been done. There's no affidavit submitted concerning any of that. There's really no genuine issue of fact. This fence has been there for a long time. It's been a division line for a long time. The court acted properly. There was no genuine issue of material fact in this case. By the end of 2000, there was nothing. We've got this ground. So I would ask you to affirm the lower court's judgment. I realize it creates some difficulties because there may be something on the south end there. But we didn't ask for that. We just asked for the property west of the fence, and that's what we got. And I think that's what we're entitled to. So we're asking for that relief. Thank you, counsel. Thank you. And I'm sorry if I seem to exasperate. I get sort of involved. Well, I don't think you seem exasperated. I think you are. This is okay. It's called zealous representation. I just want to respond to a few things that he said. As far as no facts in the record, we had no counter affidavit to his client's affidavit. However, I do want to point out that my client's verified complaint, paragraph 5, did indicate the fence is in disrepair and has not been maintained by the defendant. So the record taken together as a whole, there was that fact that was put out there straightaway that my client believed that the fence was in disrepair and not maintained. So that is a fact that was in dispute with the record taken together as a whole. Where did you say that was in the pleading? Yeah, the initial pleading on page A1. Well, how do you say that's a fact? Well, it's a verified complaint pled that she believed that the fence was in disrepair and not maintained. He said there's nothing at all in the record about that, and I just wanted to bring that to the court's attention that it is there. As far as the question about the sixth element, to quote a case from this court a year ago to establish title by adverse possession, the claimant must prove possession of the property, and it goes through elements 1, 2, 3, 4, 5. Then it says further, although not one of the five elements of possession, the claimant must also prove by clear and convincing evidence the exact location of the line to which they claim. So that's where I come from with the sixth element, as I call it. It's right there, and it's been cited. And so for them, the line would be the fence? That's what they say, the line, of course. I wouldn't believe that fits within the exactness of the location of the line. So for that reason, I think that they haven't established the elements, and it should be reversed. As for the problem, yes. I mean, if nothing more is done in this file, he's right. My client goes to sell it. I guess the best that she could do is a quick claim deed. Of course, if the best that you can offer your successor in title is a quick claim deed, it's a factor in the price. It's going to be a problem. Frankly, if nothing more happens, I'm going to talk to my client about how much more she's wanting to invest in this. But the natural thing for her to do is file a complaint to Quiet Title to sort it out. And it's unfortunate. We go through several years of litigation only to have that big unresolved question, exactly what's mine, what's yours, and the best we can do is a quick claim deed. But that's really what she's left with. Something else I want to point out. I assume she got a warranty deed. She got a warranty deed, but now given what happened. Paul was warranted in the warranty deed. Did you get all the property that was warranted? Yes. Yes. And as far as all the property, that's another issue. I don't understand. If you got all the property that was warranted in the warranty deed, why are we even here today? You're saying that the Western Boundary and the warranty deed, did you have all that? The whole purpose of this litigation is that you don't have all that. She got everything that she bargained for whenever she purchased the property. But it doesn't sound like she did. Well, no. But she did. The lower court found that she was the owner of record for all of that property. What she stands to lose happened after the transfer. So if you're implying that she would have a claim as to the prior owner, which I think the bankers said. If it took 20 years to establish adverse possession, and 20 years, in fact, had occurred, yeah, I would say there's a question of whether she got what was warranted in the deed. She, as I say, I think that the trial court, by establishing that she was the owner of record for all the property, all the way up to the line. But that's another point, I think, that's in dispute. And if I'm hearing counsel right, it sounds like we may not even have an agreement as to where the boundary line is, where the line is. And we're talking about different deeds and legal descriptions. I think I want to point something out that occurs to me. The key case in adverse possession in Illinois is Janssen, excuse me, it's the Janssen case. And it is, and it says out in 1981, the elements of adverse possession that we rely on today. Well, in that case, a prerequisite to someone asserting adverse possession rights is to acknowledge that they are not the true owner. Well, what I'm seeing throughout, what I've heard in the trial court level, what I saw in the brief that was filed by police, and also what I've heard today, it doesn't sound like they concede the point that my clients are indeed the true owner of all of this property, which is a prerequisite to asserting adverse possession rights. So it's another argument, I believe, that occurs to me, that if they can't even acknowledge from the outset that my clients are the true owners of this property, I don't see how they could have asserted adverse possession rights all along. And I'm reminded of that in listening to counsel today talk about, well, I'm not sure, well, we have these deeds and different legal descriptions and it's still kind of up in the air. And so for that reason and more, I'd ask that you remand this back to the trial court for trial. Thanks. Thank you, counsel. We'll take the matter into advisement. Await the readiness of the next case.